UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| BLACKSTONE MEDICAL, INC., ) | |
|    Plaintiff, ) | |
| ) | **Cause No. 08-CV-30145 MAP** |
| v. ) | |
| ) | |
| OSIRIS THERAPEUTICS, INC., ) | |
|    Defendant. ) | |

**OSIRIS THERAPEUTICS, INC.'S MEMORANDUM IN OPPOSITION TO BLACKSTONE MEDICAL, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Osiris Therapeutics, Inc. ("Osiris") files this memorandum in opposition to the Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction filed by Blackstone Medical Inc. ("Blackstone"). This opposition is supported by the contemporaneously filed Declarations of Lou Barnes, Dayna Buskirk, Jason Hannon, Allix Magaziner, and Randal Mills.

**PRELIMINARY STATEMENT**

Blackstone's 11th hour request for a temporary restraining order to enjoin a long planned sale of Osiris's Osteocel business line to NuVasive, Inc. ("NuVasive") should be denied. By Blackstone's own admission, its principals have known about the Asset Purchase Agreement ("APA") for the Osteocel business line and the transfer of the Blackstone Distribution Agreement from Osiris to NuVasive, Inc. since May 8, 2008, and have discussed it extensively with both Osiris and NuVasive. Nonetheless, Blackstone

waited until after business hours the day before Osiris's special meeting of stockholders to approve the APA to seek injunctive relief to stop the close. Such tactics should not be rewarded. Further, there has been no breach of Blackstone's Distribution Agreement by Osiris, and NuVasive has stated repeatedly that it will honor the Agreement. The extent of Blackstone's rights under the Distribution Agreement are irrelevant to the request for injunctive relief when the Agreement still can be enforced. Finally, Blackstone's assertion that the closing of the deal will effectuate transfer of Blackstone's confidential information from Osiris to NuVasive fails in the face of the reality that Osiris has no such confidential information. Any harm to Blackstone *if* the Distribution Agreement is breached in the future can be adequately compensated by money damages. In contrast, enjoining the close of a long planned sale of a business will irreparably harm both the seller and purchaser of that business.

## ARGUMENT

**I.   PLAINTIFF'S DELAY IN SEEKING RELIEF UNDER THE AGREEMENT CANNOT JUSTIFY EMERGENCY INJUNCTIVE RELIEF**

By its own admission, Blackstone was well aware that Osiris had agreed to sell its Osteocel business to NuVasive by May 8, 2008. (*See* Declaration of Alan Milizanno ("Milizanno Decl."), attached to Blackstone's Motion for TRO as Exhibit C, at ¶ 2; *see also* Declaration of C. Randal Mills, Ph.D. ("Mills Decl.) ¶¶ 2-3, attached as Ex A.) Indeed, Osiris Chief Executive Officer ("CEO"), Randal Mills, contacted Alan Milinazzo, Chief Executive Officer of Blackstone's parent company, Orthofix, Inc., even before the public announcement of the sale. (*See* Mills Decl. ¶ 2.) In conversations with

Mr. Milinazzo, the day immediately after the public announcement of the proposed sale, May 9, 2008, Mr. Milinazzo requested that Osiris make a reaffirmation of Osiris's commitment to honor the Blackstone Distribution Agreement. Mr. Mills did so during Osiris's Second Quarter call with financial analysts. *Id*. at ¶ 4.

It was not until late in the day on July 11, 2008, that Blackstone requested a formal meeting with Osiris regarding the Distribution Agreement *Id.* ¶ 5. Osiris disagreed with many of the points in the letter from Blackstone, but nonetheless offered an immediate meeting. *Id*. ¶ 6. Mr. Milinazzo, in Blackstone's first attempt to delay the closing scheduled for July 24, 2008, responded that he was on vacation in Nantucket and could not meet until July 23, 2008. In response, Mr. Mills offered to fly to Nantucket immediately to discuss the Distribution Agreement. Mr. Mills flew to Nantucket on July 15, 2008, and met with Mr. Milinazzo on July 16, 2008. *Id*. ¶¶ 7-8. Mr. Mills again assured Mr. Milinazzo that the Blackstone Distribution Agreement would be honored. *Id*. Although Osiris has repeatedly been available for discussions, *Id.*, Blackstone waited until after business hours on the day before the scheduled closing to seek emergency relief. This last minute request for emergency relief, like the delay in addressing the alleged disputes under the Distribution Agreement, is a simple attempt to delay the closing of a business deal that Blackstone has no right to delay or prevent.

II. **THE REQUESTED EMERGENCY RELIEF IS UNRELATED TO ANY DISPUTE UNDER THE DISTRIBUTION AGREEMENT**

The emergency relief Blackstone seeks is "to immediately enjoin Osiris, pending the outcome of arbitration, from closing upon or otherwise carrying out, Osiris's

agreement to sell its Osteocel business to NuVasive, Inc." (*See* Blackstone's Motion for Temporary Restraining Order and Preliminary Injunction ¶ 1.) Nothing in the Distribution Agreement permits this result. Rather, the Distribution Agreement provides that "Osiris may transfer this Agreement without prior written consent of Distributor . . . in connection with a merger or sale of all or substantially all of the stock or assets of Osiris relating to this Agreement . . . ." (*See* Section 11.2 of Distribution and Supply Agreement (attached to Declaration of Michael Finegan filed as Exhibit C to Motion for TRO) as Ex. 1.) Osiris is selling all of the assets of Osiris relating to the Agreement, the Osteocel business, to NuVasive. The Blackstone Distribution Agreement which relates to the supply and distribution of Osteocel is being transferred with the business.

There has been no actual or anticipatory breach of the Distribution Agreement in connection with the sale of the Osteocel business line. Even Blackstone does not allege that Osiris has breached the Agreement. Osiris has confirmed that it intends to honor the Agreement. (*See* Declaration of Lou Barnes ("Barnes Decl."), attached as Ex. B, ¶¶ 5-7.) NuVasive has confirmed that it will honor the agreement through the end of its term, December 31, 2008. (*See* Declaration of Jason Hannon ("Hannon Decl."), Blackstone erroneously stated that APA terms are in conflict with those of the Blackstone Distribution Agreement. For accounting purposes, following the close of the transaction, NuVasive will book all product revenue produced from Osiris. NuVasive will then provide the allotted 80% to Blackstone, and not directly distribute the product directly as Blackstone has intimated. The Declaration of Lou Barnes, General Manager of Osteocel for Osiris, filed with this opposition that Osiris and NuVasive will provide to Blackstone

4

pursuant to the Distribution Agreement eighty percent (80%) of the Osteocel that is produced during the remainder of 2008, thus fulfilling the obligations of the Blackstone Distribution Agreement. (*See* Barnes Decl. at ¶¶ 6-7.) Accordingly, the Distribution Agreement has not been breached and there is no anticipatory breach of any obligation under the Agreement in 2008.

The only dispute among the companies is over the issue of renewal of the Distribution Agreement after the end of 2008. That dispute obviously does not require the onerous emergency injunctive relief that Blackstone is requesting. It can be resolved anytime prior to the end of 2008 with NuVasive by agreement or by arbitration.

Moreover, Blackstone cannot establish that it has a substantial likelihood of success on the merits on that issue. The Distribution Agreement by its terms expires on December 31, 2008. Blackstone does not have a unilateral right to renew the agreement for successive years. The renewal provision provides:

> This Agreement **shall** begin on the Effective Date and **shall** continue until December 31, 2008 unless terminated earlier in accordance with this Article 6 (the "Initial Term"). The Agreement **may** be renewed after the Initial Term for one (1) year periods upon Blackstone achieving the performance objectives set forth on Exhibit D (each a "Renewal Term," and collectively with the Initial Term, the "Term").

*Id.* (emphasis added). The plain language of the Agreement clearly states that after December 31, 2008, Osiris no longer has a contractual obligation to supply its product to Blackstone. The use of the words "shall" and "may" illustrates the parties' intent for this provision: "shall" is mandatory in effect, showing the parties' intent that the Agreement *must* remain in effect until December 31, 2008, while "may" is permissive in effect,

demonstrating the parties' intent that the Agreement *could* be renewed *if* the parties both agreed on the terms and Blackstone achieved the performance objectives in Exhibit D.

Exhibit D, however, was never created. (*See* Distribution and Supply Agreement attached as Ex. 1 to Finegan Decl.) Accordingly, the renewal provision is merely an unenforceable "agreement to agree" because essential terms of the renewed contract, such as price and quantity, were omitted and left for future agreement of the parties. *See* Williston on Contracts § 4.29. The renewal provision expressly provides that the Agreement could be renewed only "upon Blackstone achieving the performance objectives set forth on Exhibit D" yet the Agreement does not contain an Exhibit D. The failure to agree on terms for Exhibit D renders essential elements of the renewal provision fatally undefined and ambiguous. *See Pharmathene, Inc. v. SIGA Technologies, Inc.*, No. 2627-VCP, 2008 WL 151855, at *13 (Del. Ch. Jan. 16, 2008); *see also Welsh v. Heritage Homes of DelaWarr, Inc.*, No. 1901-VCN, 2008 WL 442549 at *9(Del. Ch. Feb. 19, 2008) ("Delaware law requires that, 'to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations . . .'"); *see also Centreville Veterinary Hosp., Inc. v. Butler-Baird*, No. 1552-VCP, 2007 WL 1965538 (Del. Ch. July 6, 2007) (finding that a lease's renewal provision was merely an agreement to agree because it did not specify the rent for future terms).

Further, Blackstone has always known that the Distribution Agreement expired on December 31, 2008. Blackstone informed financial analysts that the Agreement would terminate on December 31, 2008, and that Blackstone was preparing contingency plans.

(*See* Barnes Decl. ¶¶ 8-9 and Exs. 1 and 2 thereto.)  Analyst reports reveal that Blackstone made those statements as early as May of 2008.  *Id*.  Blackstone's parent corporation, Orthofix, publicly stated that the Distribution Agreement expired at the end of 2008 in a Securities and Exchange Commission filing in December 2007.  (*See* Declaration of Allix Magaziner ("Magaziner Decl.") at ¶ 2 and Ex. 1 thereto.)  Seeking emergency relief the day before the close of a complex business transaction over an issue about which Blackstone had full knowledge for months is not appropriate.

Finally, Blackstone's allegation that the sale of this business will reveal confidential information if the sale closes today is unfounded.  As detailed in the Declaration of Dayna Buskirk, Osiris does not have the vast majority of the information Blackstone lists and Osiris has no intention to disclose any information.  (*See* Declaration of Dayna Buskirk ("Buskirk Decl.") ¶¶ 2-6.)  Osiris does not have specific information regarding Blackstone's sales and Osiris has not seen a list of seller-distributors and sales representatives or a surgeon and hospital customer list.  *Id*. at ¶ 2.  Moreover, NuVasive has confirmed it has received no such information and will receive no such information.  Hannon Decl. ¶ 4.

## III.   THE BALANCE OF HARMS FAVOR DENIAL OF THE INJUNCTION

This Court should deny injunctive relief because Blackstone cannot demonstrate irreparable harm if such relief is not granted.  Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," and the burden of demonstrating irreparable harm "rests squarely upon the movant."  Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  To show irreparable

harm, the moving party must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  Id. (finding that irreparable harm exists where a party has no adequate remedy at law); Packaging Indus. Group, Inc. v. Cheney, 405 N.E.2d 106, 111 (Mass. 1980) ("the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits").  If monetary compensation will adequately redress the harm, the injury is not considered irreparable.  See Cheney, 405 N.E.2d at 114 (affirming the denial of injunctive relief where monetary damages would adequately redress "any harm the plaintiffs might suffer prior to a final judgment" and where the plaintiffs offered no evidence that the defendant would be unable to pay such monetary damages).  Injunctive relief is simply not warranted where monetary damages suffice. *In re Aerovox, Inc.*, 281 B.R. 419, 433 (Bnkr. D. Mass. 2002).

Here, if injunctive relief is not granted, Blackstone may suffer a purely monetary injury -- the loss of the profits it earns from the sale of Osiris' product.  Delaware courts permit recovery for lost profits in breach of contract actions when there is concrete data of past profits history.  *See, e.g.*, *Crowell Corp. v. Himont USA, Inc.,* No. 86C-11-125, 1994 WL 762663, *3 (Del. Super. Dec. 8, 1994) (*citing Tanner v. Exxon Corp.*, No. 79C JA-5, 1981 WL 191389, at *5 (Del. Super. Ct. July 23, 1981)).  Accordingly, this is precisely the type of injury that can be redressed through monetary compensation if Blackstone were to prevail in arbitration or litigation.  Therefore, this Court should deny

Blackstone's motion for a TRO because it will not suffer the type of irreparable harm that warrants the "extraordinary remedy" of injunctive relief.

In contrast, Osiris and NuVasive will suffer significant harm if the sale does not close today as planned. While Blackstone's economic harm is speculative at best, Osiris would incur economic damages due to the failure of the proposed transaction with NuVasive to close immediately following Osiris' meeting of shareholders on Thursday, July 24, 2008. First, Osiris is a small development stage biotechnology company and currently not a profitable entity. As such, Osiris relies upon access to certain capital sources to conduct its day-to-day operations. Osiris has stated affirmatively that this transaction is important for the company since it provides Osiris with a substantial amount of non-dilutive capital over the near term. Osiris stands to receive $35,000,000 in cash from NuVasive at the closing. Second, Osiris will receive substantial consideration from NuVasive based upon Osiris meeting certain future milestones. If the closing is delayed, Osiris will be delayed and in some cases prevented from meeting these milestones and will suffer additional near term economic harm. (*See* Barnes Decl. ¶ 10.)

Significant harm also would inure to NuVasive if the sale is enjoined. NuVasive has spent significant time, money and resources identifying, negotiating, documenting and performing due diligence on Osiris and the Osteocel business unit. NuVasive has also made public announcements about the pending transaction and would suffer a significant loss of reputation in the marketplace and goodwill by an improvidently granted injunction. In addition, NuVasive has already formed a new business unit in

9

contemplation of the transaction closing. Key personnel have been hired, including personnel who have moved across the country to California to run the business. NuVasive has already begun negotiations for preclinical and clinical work to gather scientific data about the Osteocel product to expand commercial opportunities. (See Hannon Decl. ¶ 5.)

## CONCLUSION

The last-minute filing by Blackstone is an obvious tactic to delay a complex business transaction of which Blackstone has been fully aware for more than two and a half months. The Distribution Agreement between Osiris and Blackstone plainly provides that it can be transferred as part of a sale of the Osteocel business. Accordingly, Blackstone should not be permitted to prevent or delay the sale of the Osteocel business.

By its attorneys,

/s/ *James J. Dillon*
James J. Dillon (BBO No. 124660)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02111 - 2600
(617) 832 - 1109

Of Counsel:

Tami Lyn Azorsky
McKenna Long & Aldridge LLP
1900 K Street, N.W., Suite 100
Washington, DC  20006
(202) 496-7582

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and accurate copy of this document, which was filed via the Court's ECF system, will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 24, 2008.

                                                  /s/ *James J. Dillon*
                                                  James J. Dillon (BBO No. 124660)
                                                  jdillon@foleyhoag.com

Dated:  July 24, 2008

DC:50560849.1